**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x
                                                             :
In re:                                                       :   Chapter 11
                                                             :
    VALERITAS HOLDINGS, INC., *et al.*,[1]                 :   Case No. 20-10290 (___)
                                                             :
        Debtors.                             :   (Joint Administration Requested)
-------------------------------------------------------------x

**DECLARATION OF JOHN E. TIMBERLAKE IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

    I, John E. Timberlake, hereby declare under penalty of perjury:

    1.    I am the President, Chief Executive Officer, and a member of the board of directors (the "Board") of Valeritas Holdings, Inc., a corporation organized under the laws of Delaware, and its affiliated debtors and debtors in possession (collectively, the "Debtors" or the "Company," as applicable) in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). I have served as the Company's Chief Executive Officer and a Board member since February 2016, and I have been the President of the Company since August 2008. I also previously held the position of Chief Commercial Officer and General Manager. Prior to joining the Company, I held positions of increasing responsibility at Sanofi-Aventis (now Sanofi), and prior to working in the healthcare industry, I was a manager at Deloitte & Touche LLP from 1986 to 1991 and was a certified management accountant and a certified public accountant. I earned my Bachelor of Science degree in accounting from Northwest Missouri State University, a Master of Science degree in management from Purdue University, and a Master of Business Administrative degree from ESC Rouen in France (now NEOMA Business School).

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Valeritas Holdings, Inc. (8907); Valeritas, Inc. (1056); Valeritas Security Corporation (9654); Valeritas US, LLC (0007). The corporate headquarters and the mailing address for the debtors is 750 Route 202 South, Suite 600, Bridgewater, New Jersey 08807.

2.      Except as otherwise indicated, all facts set forth in this declaration (the "Declaration") are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

3.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of these Chapter 11 Cases and in support of: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on February 9, 2020 (the "Petition Date"); and (b) the relief that the Debtors have requested from the Court pursuant to the motions and applications described herein (collectively, the "First Day Motions").

4.      To familiarize the Court with the Debtors, their chapter 11 goals, and the relief that the Debtors will seek in connection with these Chapter 11 Cases, this Declaration is organized in five parts. Part I provides an introduction to the Debtors and information on the Debtors' business operations. Part II provides an overview of the Debtors' organizational structure and capital structure. Part III describes the circumstances leading to the commencement of these Chapter 11 Cases. Part IV describes the Debtors' chapter 11 goals. Part V sets forth additional relevant facts in support of each of the First Day Motions filed in connection with these Chapter 11 Cases.

# I.

## THE DEBTORS' BUSINESS

5.     Valeritas Holdings, Inc. is a commercial-stage medical technology company, focused on improving health and simplifying life for people with diabetes by developing and commercializing innovative technologies.  The Company's flagship product is the V-Go® Wearable Insulin Delivery device ("V-Go®"),[2] which is a simple, affordable, all-in-one basal-bolus[3] delivery option for patients with type 2 diabetes[4] that is available in three convenient doses and is worn like a patch, and can eliminate the need for multiple daily injections.  Using the Company's proprietary h-Patch™ technology,[5] V-Go® is the only basal-bolus insulin delivery device on the market today that was specifically designed keeping in mind the needs of patients with type 2 diabetes.

6.     V-Go® fills a critical need for patients with type 2 diabetes.  Using fast acting insulin, V-Go® administers a continuous preset basal rate of insulin over a 24-hour period and

---

[2]     The Company received approval of V-Go® from the Food and Drug Administration (the "FDA") in 2010 and commenced commercial sales in 2012.  The Company has produced over 22 million V-Go® devices to date.

[3]     A person's insulin is divided into two components—a basal dose and a bolus dose. The basal dose is referred to as the "background" dose of insulin in that it maintains a person's blood glucose levels steady during non-food-intake periods.  The bolus dose of insulin is released by the body in response to food intake in order to control post-intake hyperglycemia.  A basal-bolus dose maintains a type 2 diabetic's insulin throughout the day.

[4]     "Diabetes is a chronic (long-lasting) health condition that affects how your body turns food into energy." Ctr. For Disease Control & Prevention, About Diabetes, https://www.cdc.gov/diabetes/basics/diabetes.html, (Aug. 6, 2019).  Approximately 30.3 million adults in the United States, or 9.4% of the population, has diabetes. *Id.*  There are three main types of diabetes: type 1, type 2, and gestational diabetes occurring in pregnant women. *Id.*  Type 2 diabetes is the most prevalent type, with approximately 90% of diabetics having type 2 diabetes. *Id.*  People with type 2 diabetes do not make sufficient amounts of insulin or cannot adequately use the insulin their bodies produce. *Id.*  If left unchecked, type 2 diabetes can lead to serious health issues. *Id.*  Indeed, "[d]iabetes is the seventh leading cause of death in the United States." *Id.*  "In the last 20 years, the number of adults diagnosed with diabetes has more than doubled." *Id.*  Indeed, globally, diabetes is projected to increase by 35% by 2040 and it is estimated that diabetes will account for 12% of global health expenditures. *See* INT'L DIABETES FED'N, IDF DIABETES ATLAS (7th ed. 2015).

[5]     The Company's h-Patch™ technology enables patients to closely mimic the body's normal physiological patters of insulin delivery by delivering a single type of insulin at a predictable and continuous preset basal rate over a 24-hour period and providing convenient and discreet on-demand bolus dosing at mealtimes.

EAST\171886743.11

provides discreet on-demand bolus dosing at mealtimes.  V-Go® provides patients with an easy-to-use, more discreet basal-bolus insulin regimen, which is designed to be worn on the skin like a patch, under clothing, and weighs less than two ounces when filled with insulin. V-Go® can be worn throughout a patient's busy day, including during exercise, showers, and sleep.  It is a 24-hour disposable mechanical device that operates without electronics, batteries, infusion sets and with fewer injections than using insulin syringes or pens.  Additionally, due to the convenience V-Go® offers to patients, the device facilitates patients' real-world adherence to a basal-bolus insulin regimen and, critically, helps patients achieve their A1c (glucose control) goals.[6]

7.    V-Go® is manufactured in Southern China by the Company's primary contract manufacturing organization (the "CMO") in accordance with current good manufacturing practices, or cGMP.  The CMO uses Valeritas-owned custom-designed, semi-automated manufacturing equipment and production lines to meet the Company's quality requirements.  Separate contract manufacturing organization companies in China perform release testing, sterilization, inspection, and packaging functions.  The processes utilized in the manufacturing and testing of V-Go® have been verified and validated to the extent required by the FDA and other regulatory bodies.[7]

8.    The Company offers direct and indirect patient services and programs to help educate healthcare providers and patients on the benefits and technical aspects of V-Go®.  For instance, the Company offers live customer service—the V-Go® Customer Care Center ("VCC").

---

[6]    Due to a number of factors, including the inconvenience of administering needle-based insulin injections throughout the day, patients with type 2 diabetes historically find it challenging to meet their A1c goals (A1c is a measure of glucose control).  Indeed, approximately 80% of type 2 diabetics are not meeting their A1c goals.  *See* U.S. Roper Diabetes Market Study provided by GfK Custom Research LLC.  *See* GfK Custom Res. LLC, U.S. Roper Diabetes Patient Market Study (2014).

[7]    As a medical device manufacturer, the Company's contract manufacturing facilities and the facilities of our sterilization and other critical suppliers are subject to periodic inspection by the FDA and corresponding state and foreign agencies.

Through the VCC, the Company offers general support, training on the operational aspects of V-Go® (by phone or video), and reimbursement support designed to help answer patients' reimbursement-related questions. The Company also offers patient coaching through its clinical education program, assistance with benefits verification, co-pays, and rebate processing, reimbursement support services, and other similar services designed to support patients, make V-Go® financially accessible to more patients, and ensure the safe and correct use of V-Go®.

9.      In addition, the Company's highly-trained salesforce educates and trains healthcare providers, including Certified Diabetes Educators on how to use V-Go® so that they can better serve their patients. The Company's salesforce also has the ability to train patients directly and offers supplemental training assistance, including through contracted patient trainers and online resources. Although V-Go® is a device, the product is reimbursed at the pharmacy under Medicare Part D and by a majority of commercial insurance companies. The Company also makes starter kits available to new V-Go® patients free of charge and offers a co-pay reduction program for patients who have insurance through commercial insurance companies to help defray medication costs and make V-Go® even more affordable.[8]

10.     The Company does not engage in direct sales to patients, but instead partners with distributors to make V-Go® available to patients for prescription fulfilment or purchase primarily through retail pharmacies. The Company has distribution agreements with all of the national (and many regional) wholesalers, as well as with important medical supply companies. Some of the

---

[8]      V-Go® is covered by Medicare Part D as well as commercial insurance plans covering the majority of patients. Further, insulin delivery with V-Go® is significantly less expensive, especially in the first year of use, than treatment with programmable insulin pumps.

Company's key distribution agreements are with McKesson Corporation, Cardinal Health, and Amerisource Bergen Drug Corporation.

11.    In addition to the Company's use of its h-Patch™ technology in V-Go®, the Company believes that its h-Patch™ technology has the potential for additional applications outside of insulin delivery and has spent time, energy, and other resources researching and developing these applications and technologies, including in the areas of delivering medication for patients suffering from epilepsy, Parkinson's Disease, and to facilitate enzyme/hormone replacement therapy, among others.

12.    The Company has also been developing companion products designed to complement V-Go®, such as the V-Go® SIM™, a blue-tooth snap-on accessory to V-Go®, which will allow patients to engage in real-time tracking information of basal and bolus utilization through their smart devices, such as phones and tablets for added convenience.

## II.

## THE DEBTORS' ORGANIZATIONAL AND CAPITAL STRUCTURE

### A.    The Debtors' Prepetition Organizational Structure

13.    Valeritas, Inc. ("Valeritas") and Valeritas Security Corporation, each a corporation organized under the laws of Delaware, are wholly owned subsidiaries of Valeritas Holdings, Inc. Valeritas US, LLC, a limited liability company organized under the laws of California, is a wholly owned subsidiary of Valeritas, Inc.  The Debtors have no non-debtor affiliates.[9]

---

[9]    A corporate organizational chart depicting the ownership structure of the Debtors is attached to this declaration as **Exhibit A**.

**B.      The Debtors' Prepetition Capital Structure**

14.      Among other things, the Debtors have relied on the arrangements described below to finance their business.

a.    Term Loan Agreement

15.      On May 24, 2013, debtor Valeritas as borrower, and certain subsidiaries as guarantors, entered into a prepetition term loan agreement (as amended and restated on August 5, 2014, and later further amended and restated on May 3, 2016, the "Prepetition Term Loan") with Capital Royalty Partners II L.P. (the "Prepetition Secured Agent"), Capital Royalty II Partners – Parallel Fund "A" L.P., and Parallel Investment Opportunities Partners II L.P. (collectively, the "Prepetition Secured Lenders").  The Prepetition Term Loan is a senior secured loan that had an initial six-year term (later extended, as described below) and is secured by substantially all of the Debtors' assets.

16.      Pursuant to an amendment dated as of February 9, 2017 (the "First Amendment"), the Prepetition Term Loan was amended to provide an interest rate of 11% per annum and extend the interest-only period to March 31, 2022.  The First Amendment further required quarterly cash interest payments beginning on June 30, 2019 and extended the deadline for full payment under the loan to March 31, 2022.  The First Amendment also reduced the minimum covenant cash and cash equivalent requirements to $2.0 million from $5.0 million.  In March 2017, in connection with the First Amendment, the Prepetition Secured Lenders exchanged $25 million in principal amount of the Prepetition Term Loan for 2.5 million shares of Series A Preferred Stock at a price of $10.00 per share

17.      Pursuant to a second amended dated as of September 30, 2019 (the "Second Amendment"), the Debtors and the Prepetition Secured Lenders further amended the Prepetition

7

Term Loan.  The Second Amendment increased the interest rate to 13% per annum, removed the quarterly cash interest payments, and allowed for accrual of PIK interest instead.  The $2.0 million financial covenant remained in place.  The Second Amendment further provided for a $3.0 million back-end facility fee (the "Back-End Facility Fee") on the outstanding principal balance immediately following the debt exchange (described below) in addition to any new PIK interest, payable upon completion of the Prepetition Term Loan.  In connection with the second amendment, the Prepetition Secured Lenders exchanged $22.7 million in principal amount of the Prepetition Term Loan for 15,575,586 shares of Series B Preferred Stock at a price of $1.46 per share (the "Conversion Transaction").

18.    As of December 31, 2019, the outstanding principal amount due under the Prepetition Term Loan Agreement was $16, 124,777.00 plus the Back-End Facility Fee equal to $3,224.955.00 plus accrued interest, fees and expenses (including attorneys' fees).

19.    On February 7, 2020, prior to the Petition Date, the Prepetition Secured Lenders delivered a notice of default to the Company alleging, among other things, that a "Material Adverse Change" had occurred constituting an "Event of Default" under the Prepetition Term Loan (as those terms are defined therein).

20.    Prior to the Petition Date, the Company and the Prepetition Secured Lenders entered into a settlement (the "CRG Settlement") which will be the subject of a motion under Rule 9019 of the Federal Rules of Bankruptcy Procedure to be filed with this Court on or before February 11, 2020.  The Company and the Prepetition Secured Lenders agreed to settle a number of issues, including the Debtors' ability to use Cash Collateral and enter into the priming DIP Facility, as well as certain claims and causes of action the Prepetition Secured Lenders alleged to have against the Debtors related to the Conversion Transaction.  Among other things, the CRG

Settlement fixes (a) the total secured claim owed to the Prepetition Secured Lenders at $20.0 million (representing the outstanding principal amount of obligations under the Prepetition Term Loan as of December 31, 2019, exclusive of the Back-End Fee (which is to be waived upon Court approval of the CRG Settlement), plus a portion on account of the settlement of certain claims and causes of action) and (b) the total unsecured claim owed to the Prepetition Secured Lenders at $18.825 million (representing the settlement of the aforementioned claims and causes of action).

b.  Prepetition Senior Subordinated Note

21.     In 2011, Valeritas issued a $5.0 million senior subordinated note (the "WCAS Note" and, together with the Prepetition Term Loan, the "Prepetition Financing") to WCAS Capital Partners IV L.P ("WCAS" and, together with the Prepetition Secured Lenders, the "Prepetition Lenders"). Valeritas entered into a series of forbearance agreements to modify the WCAS Note. The most recently executed amendment to the WCAS Note, dated May 23, 2013 (as amended on March 28, 2017), bears interest at 10% per annum. All interest accrues as compounded PIK interest and is added to the aggregate principal amount of the note semiannually. The outstanding principal and accrued PIK interest is due in full in September 2021, and no interest payments are required during the term of the loan.

22.     In March 2017, $2.5 million of the WCAS Note was exchanged for 250,000 shares of Series A Preferred Stock, at a price of $10.00 per share. On September 30, 2019, $2.3 million of the WCAS Note was exchanged for 1,547,698 shares of Series B Preferred Stock at a price of $1.46 per share.

23.     As of the Petition Date, $1,608,497 remains due and owing under the WCAS Note.

9

### C.    Letters of Credit

24.    Prior to the Petition Date, the Company issued three letters of credit:  (a) in favor of Winthrop Resources Corporation in the amount of $ 350,352 in connection with the finance of laptops, tablets, and other similar equipment utilized by the Company's salesforce; (b) in favor of Silicon Valley Bank in the amount of $42,500 in connection with three corporate credit cards; and (c) in favor of Kaiser Permanente in the amount of $75,000 in connection with an insurance rider relating to V-Go®.

### D.    Equity

25.    Valeritas Holdings, Inc. became a publicly traded company through its reverse merger with Cleaner Yoga Mat, Inc. on May 3, 2016, and began trading on The Nasdaq Capital Market under the symbol "VLRX" on March 28, 2017.  As of the Petition Date, the Company's market capitalization was approximately $6,622,000, based on approximately 8.3 million shares of common stock, par value $0.001 per share, outstanding on the Petition Date. In addition, the Company has outstanding 2.5 million issued shares of Series A Preferred Stock, par value $0.001 per share, and 17,123,284 issued shares of series B preferred Stock, par value $0.001 per share. The Debtors also have outstanding (a) 519 warrants to acquire 519 shares of common stock at a weighted average exercise price of $8.80 per share, which were issued to certain affiliates of the placement agents in the private placement offering that was conducted as part of the May 2016 reverse merger, and (b) 3,750,000 Series A Warrants to acquire 187,500 shares of common stock at an exercise price of $12.00 per share, which were issued in connection with the November 2018 public offering.  Both the private placement warrants and the Series A Warrants have a term of five years and are of *de minimis* value.

10

## III.

## EVENTS PRECIPITATING THE CHAPTER 11 CASES

26.     The Company relies on sales of V-Go® to generate all of its revenue.  Although the Company has experienced commercial success with V-Go®, as of the Petition Date, the Company was still in the commercial growth stage of its operations and, therefore, had not generated profits or free cash flows.  For approximately eleven months prior to the Petition Date, the Company was engaged in an out of court sale and marketing process (the "Out of Court Process") led by a boutique investment bank.  In December 2019, the Company was facing diminishing liquidity, a lack of access to additional capital, and potential near-term defaults under the Prepetition Term Loan when it experienced a temporary supply disruption due to a manufacturing yield issue.[10]  This event led the Company's two potential buyers in its Out of Court Process to withdraw their bids.

27.     Management immediately took steps to identify and correct the manufacturing yield issue.[11]  The Company halted all deliveries of V-Go®, retested all of its existing inventory as well as product it controlled in the United States, opened a corrective-action preventative action (or CAPA) investigation, identified the root cause of the yield issue, modified production specifications to meet yield requirements going forward, and conducted a health hazard evaluation. Importantly, the Company's manufacturing yield issues did not impact patients and no large-scale

---

[10]     The Company disclosed the manufacturing yield issue on December 20, 2019 through a Form 8-K filing with the Securities and Exchange Commission as well as a formal press release.  Valeritas Holdings, Inc., Current Report (Form 8-K) (Dec. 20, 2019); *Valeritas Experiences a Temporary Supply Disruption Resulting in Revised Preliminary Financial Results for 2019 Fourth Quarter and Full Year*, Valeritas (Dec. 20, 2019), https://www.valeritas.com/investors/press-releases/press-release-details/2019/Valeritas-Experiences-a-Temporary-Supply-Disruption-Resulting-in-Revised-Preliminary-Financial-Results-for-2019-Fourth-Quarter-and-Full-Year/default.aspx.  The price of the Company's common stock dropped following this announcement, and on February 5, 2020, Nasdaq Regulation issued a letter to the Company notifying it that it was no longer in compliance with The Nasdaq Capital Markets' "Listing Rules."

[11]     Yield in reference to V-Go® refers to the basal rate release criteria.  While V-Go® previously tested within acceptable basal release yields, the Company determined that a higher threshold should be employed and worked diligently to meet this self-imposed increased yield level.

11

V-Go® outages were reported.  The Company anticipates returning to normal yield and product-shipment levels by early to mid-March 2020.  While management quickly identified the root cause of the issue and implemented corrective actions, the Company's existing liquidity constraints were further exacerbated by the supply disruption and the Company's one-time write-off of approximately $3.5 million of inventory.  Further, under these conditions, the Company's existing lenders would not extend further credit, nor could the Company secure financing from another source.

28.     Notwithstanding the Company's quick response to address the manufacturing yield issue, it could not resurrect the Out of Court Process.  Moreover, the yield issue unfortunately coincided with certain external factors impacting production.  The CMO and the Company's other manufacturers and suppliers in China are closed for the Lunar New Year (Chinese New Year) celebrations, which took place this year between January 27, 2020 through February 3, 2020, which was extended through February 9, 2020 by the Chinese government due to the coronavirus epidemic in China.

29.     The occurrence of the Chinese New Year holiday has not posed a problem in the past, because the Company historically maintained at least 3 months' worth of finished product inventory to cover periods when its Chinese suppliers were closed.  This year, however, inventory levels were substantially reduced as a result of the production disruption in December 2019.  Thus, the work stoppage during the Chinese New Year holiday posed a problem for the Company for the first time.  This problem was exacerbated due to the rapid onset of the coronavirus epidemic and the Chinese government's measures to combat the spread of the disease, which included extending the holiday for an additional week.

30.    Additionally, many Chinese businesses, including the Company's CMO, employ rural workers and, as a result, may experience production capability issues due to the uncertainty surrounding when these rural employees will return to work.  All of the foregoing unanticipated delays further strained the Company's balance sheet and truncated its financial runway, although, due to careful planning, it generally has not impacted the Company's ability to make V-Go® available to the majority of patients to date.  Specifically, these delays have impacted new production, retesting of existing V-Go® kits, and the packaging and shipping of finished goods to the United States.

31.    In addition, the filing of these Chapter 11 Cases was also motivated by concerns over employee retention.  The Company's workforce is highly trained and well-versed in V-Go®, as well as in diabetes and diabetes treatments generally.  As such, the Company's workforce is extremely attractive to the Company's existing competitors, to companies seeking to enter the medical device and type 2 diabetes treatment markets, and to potential purchasers, including the Stalking Horse Bidder (as defined below).

32.    Prior to the Petition Date, two of the Company's senior executives resigned.  In addition, following the Company's issuance of the December 20, 2019 Form 8-K, which indicated that the Company was considering all strategic alternatives, including filing for chapter 11, the Company's employees have been aggressively pursued by competitors and many have expressed concerns about their future employment with the Company.  These factors, coupled with the facts that, under the Company's current financial circumstances, non-salesforce employees would likely not receive their earned variable compensation (a significant proportion of the employees' total compensation), and the salesforce's variable incentive compensation typically paid by March was

13

also at risk,[12] led the Company to fear that a significant number of its employees would depart immediately after the filing.  If this were to occur, it would seriously jeopardize patient access to V-Go®, the continuing viability of the Debtors' business, and the proposed stalking horse transaction.

33.    As discussed in <u>Part IV</u> below, the Debtors' existing workforce is a crucial aspect of the Debtors' plan to maximize the value of their business in chapter 11.  The Petition Date was chosen, in part, to signal to the Debtors' employees a clear and rapid path to a going concern sale, including likely employment if the Stalking Horse Bidder (defined below) is the successful bidder. This effort, coupled with certain incentive and retention programs described in more detail below, is designed to quell employee fears and maximize the value of the Debtors' assets.

34.    Ultimately, the Company's chief concern was that its liquidity, capitalization, and potential workforce issues might eventually impact the availability of V-Go® to patients.  In light of the foregoing, including the Company's unsuccessful efforts to sell its business in the Out of Court Process, the Company determined that initiating these Chapter 11 Cases was the best option to preserve its going concern business, maximize value for all creditors and stakeholders, and ensure that the benefits of V-Go® will continue to be available to patients with type 2 diabetes, as well as to foster the Company's long-term vision for V-Go® through a well-capitalized purchaser.

**IV.**

## CHAPTER 11 GOALS

35.    Following the collapse of the Out of Court Process and given its dwindling liquidity, the Company engaged PricewaterhouseCoopers LLP ("<u>PwC</u>") as financial advisor, and

---

[12]    Incentive compensation comprises the largest portion of the compensation paid to the Debtors' salesforce.  It is earned on a quarterly basis and paid in March of each year.

14

Lincoln International ("Lincoln" and, together with DLA Piper LLP (US) and PwC, the "Restructuring Professionals") as investment banker, to explore strategic alternatives, including a restructuring through a chapter 11 process, and in particular, a potential going concern sale of the business through section 363 of the Bankruptcy Code, as well as funding to facilitate that process.

36.     Since December 2019, the Restructuring Professionals have been working diligently to facilitate a soft landing into chapter 11 for the Company.  Lincoln has been leading a marketing process to obtain debtor in possession financing and a stalking horse purchaser for the Company's assets.  The business primarily is comprised of V-Go® (the current and future value of a unique and proven product), the Company's attractive intellectual property portfolio (which includes approximately 161 patents granted and 50 patents pending), the value in additional applications of the Company's proprietary h-Patch™ technology, the ability to leverage scalable manufacturing operations, the potential to capitalize on a growth market, and a loyal and highly skilled workforce.

37.     On December 20, 2019, Lincoln started supplementing and building out the data room that initially was populated during the Out of Court Process.  Lincoln also began reaching out to potential purchasers, including companies focused on diabetes drug delivery or medical technology, global biopharmaceutical companies, diversified medical technology companies, and institutional investors focused on the life sciences space.  Lincoln contacted approximately sixty strategic and financial parties. These efforts included, but were not limited to, in-depth calls and meetings with management, telephonic and in-person conversations with Lincoln, and physical site visits.

38.     On February 9, 2020, the Company and Zealand Pharma A/S (together with its designee, if any, the "Stalking Horse Bidder") entered into that certain asset purchase agreement

(the "Stalking Horse APA"), through which the Stalking Horse Bidder agreed to purchase the Debtors' assets under section 363 of the Bankruptcy Code for $23 million in cash plus the assumption of certain liabilities, including up to $1.5 million in cure costs.  The Stalking Horse Bidder intends to extend offers of employment to a majority of the Company's employees, and the Debtors are required to use commercially reasonable best efforts to, among other things, to "keep available the services of their respective officers and Employees."  In fact, there is a closing condition in the Stalking Horse APA that requires "substantially all" of the Company's employees, and all of the Key Employees, to whom the Stalking Horse Bidder extends offers of employment to have accepted those offers as of (and conditioned upon) closing.

39.     Contemporaneously with this Declaration, the Debtors are filing a motion seeking approval of certain bidding and sale procedures, as well as approval of the sale of substantially all of the Debtors' assets to the highest or otherwise best bidder.

40.     Almost immediately after the Company reached an agreement in principle with the Stalking Horse Bidder, Lincoln turned its attention to obtaining debtor in possession financing from third party sources to fund the Chapter 11 Cases and support the section 363 sale process.[13]

41.     Initially, Lincoln approached the Stalking Horse Bidder and the Prepetition Secured Lenders to determine if either would be willing to extend debtor-in-possession financing to the Company.  Neither party was willing to do so.  In light of this, Lincoln canvassed the market and approached 50 potential outside lenders regarding the Debtors' financing needs.  Lincoln's outreach resulted in 20 nondisclosure agreements being executed, allowing those potential lenders to access a confidential information presentation and an online data room.  Five of those parties

---

[13]     Neither the Prepetition Secured Lender nor the Stalking Horse Bidder were willing to provide debtor in possession financing to the Company.

ultimately submitted postpetition financing proposals.  Of the five proposals submitted, Lincoln recommended moving forward with two potential lenders for further discussions and to ensure that postpetition financing would be secured prior to commencement of the Chapter 11 Cases. Following extensive diligence efforts and negotiations, the Company entered into that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Facility Term Sheet (the "DIP Facility") with HB Fund LLC (the "DIP Lender"), and consented to by the Prepetition Agent, on February 9, 2020.  The terms of the DIP Facility are summarized in Part V of this Declaration.

42.     Finally, as discussed above, and as is apparent from the terms of the Stalking Horse APA, the Company's employees are so critical to the Debtors' business that the Stalking Horse Bidder is seeking to extend offers of employment to nearly all of the Debtors' workforce, which would be contingent upon the stalking-horses successful bid and close of the transaction.  Upon information and belief, however, the Company's competitors are aggressively pursuing the Company's employees.  In recognition of these facts, the Company, in consultation with its Restructuring Professionals, and with the approval of the Compensation Committee of the Company's Board of Directors, developed a key employee retention plan ("KERP") to ensure that certain rank and file employees remain with the Company through the closing of the sale and a key employee incentive plan ("KEIP") to ensure that certain key executives are appropriately incentivized to achieve the highest or otherwise best offer for the Company's assets.  The Debtors shortly will file a motion to approve the KEIP and KERP, as well as in the declaration in support of that motion.  These programs are truly critical to the success of these Chapter 11 Cases.

43.     The Debtors are confident that they have put in place the necessary elements to ensure the ongoing viability of their business, including the continued delivery of V-Go® to patients, and the success of these Chapter 11 Cases, even despite the external factors that have

17

contributed to their commencement.

## V.

## SUMMARY OF RELIEF SOUGHT THROUGH FIRST DAY MOTIONS[14]

A.      **Motion of the Debtors for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases ("Joint Administration Motion")**

44.      Through the Joint Administration Motion, the Debtors seek entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only.  I anticipate that many of the notices, motions, other pleadings, and orders in these cases will affect more than one Debtor.  In addition, the Debtors share many of the same creditors.  Therefore, I believe that joint administration will (i) save time and expenses for the Court and for the Debtors' estates, and (ii) avoid duplicative and potentially confusing filings by permitting counsel for all parties in interest to file all notices and pleadings on a single case docket, under a single caption.  I understand that joint administration will also protect all parties in interest by ensuring that creditors in each of the Debtors' respective bankruptcy cases will be informed of the various matters before the Court in these Chapter 11 Cases.

45.      I have been advised that the rights of the Debtors' respective creditors and stakeholders will not be adversely affected by the joint administration of these cases inasmuch as the relief sought is purely procedural and in no way intended to affect substantive rights or permit substantive consolidation of the separate Debtors' estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

---

[14]      Capitalized terms in this Part V that are used but not defined in this Declaration have the meaning set forth in the applicable First Day Pleading, and each such pleading is incorporated into this Declaration by reference.

18

**B.      Motion of the Debtors for Entry of an Order Authorizing the Debtors to File (I) a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, and (II) a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors ("Creditors' Matrix Motion")**

46.      Through the Creditors' Matrix Motion, the Debtors seek authority to (i) prepare a consolidated list of creditors in the format currently maintained in the ordinary course of business in lieu of submitting a separate creditors' matrix in the format required under Local Rule 1007-2(a) for each Debtor, and (ii) provide a consolidated list of the thirty largest creditors of all Debtors, rather than separate lists of the largest thirty creditors for each Debtor.  I believe that the relief requested by the Debtors is warranted because they have identified thousands of entities to which notice of certain proceedings in these Chapter 11 Cases must be provided.  Although the Debtors maintain computerized records, certain Debtors do not presently maintain lists of the names and addresses of their creditors on a Debtor-specific basis.  Conforming the Debtors' records into the creditors' matrix format as required under Local Rule 1007-2(a) would be an unnecessarily burdensome task given the size and scope of these Chapter 11 Cases and the number of the Debtors' creditors.  Furthermore, because some creditors may be creditors of multiple Debtors, a consolidated creditor matrix will reduce administrative costs by ensuring that each party on the consolidated creditor matrix receives only one copy of each mailing.  Accordingly, I respectfully submit that the Creditors' Matrix Motion should be granted.

**C.      Motion of the Debtors for Entry of an Order (I) Approving Certain Procedures to Maintain the Confidentiality of Patient Information as Required by Applicable Privacy Rules; (II) Authorizing the Debtors to File Under Seal Portions of the Debtors' Consolidated Creditor Matrix Containing Certain Individual Creditor Information; and (III) Granting Related Relief (the "Privacy Protection Motion")**

47.      Through the Privacy Protection Motion, the Debtors seek the entry of an order (a) approving certain Privacy Procedures to maintain the confidentiality of patent information as required by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), (b)

19

authorizing the Debtors to file under seal portions of the Debtors' consolidated creditor matrix containing certain individual creditors' personally identifiable information, and (c) granting related relief.  By offering the Patient Support Services, described herein and in the Privacy Protection Motion, the Debtors necessarily gain access to patients' personally identifiable and medical information, the disclosure of which could potentially violate HIPPA.  Further, disclosing the personal information, including the home addresses, of the Debtors' employees and independent contractors would create an undue risk of identity theft and could generate resentment among the employees at this critical juncture in the cases. The Debtors balanced the presumption in favor of disclosure against the harm to patients and employees that would come if such disclosure were made and, I respectfully submit that the balance of harms weighs in favor of the patients and employees.  Accordingly, I submit that the Privacy Protection Motion should be approved.

> **D.**     **Application of the Debtors for Entry of an Order Authorizing Retention and Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent, Pursuant to 28 U.S.C. § 156(c), Effective *Nunc Pro Tunc* to the Petition Date ("Section 156(c) Application")**

48.     Through the Section 156(c) Application, the Debtors seek the appointment of Kurtzman Carson Consultants LLC ("KCC") as claims and noticing agent for these Chapter 11 Cases.  The Debtors selected KCC after soliciting and reviewing proposed engagement terms from three (3) other parties that have been approved by this Court to serve as claims and noticing agents. As the claims and noticing agent, KCC would assume full responsibility for the distribution of statutory notices to creditors and other parties in interest and the maintenance, processing, and docketing of proofs of claim filed in these Chapter 11 Cases.  Given the complexity of these Chapter 11 Cases and the number of creditors and other parties in interest involved, I believe that the appointment of KCC will maximize the value of the Debtors' estates for all of their stakeholders and will help to facilitate the efficient administration of these Chapter 11 Cases while

alleviating these burdens for the Clerk of the Court. Accordingly, I respectfully submit that the Section 156(c) Application should be approved.

E.       **Motion of the Debtors for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Companies; and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service ("<u>Utilities Motion</u>")**

49.       Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders (a) approving the Debtors' proposed form of adequate assurance of postpetition payment to the Utility Companies of a two-week deposit for each Utility Company, (b) establishing procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance, and (c) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors solely on the basis of the commencement of these Chapter 11 Cases, a debt that is owed by the Debtors for services rendered prior to the Petition Date, or on account of any perceived inadequacy of the Debtors' Proposed Adequate Assurance.

50.       In the ordinary course of the operation of their business, the Debtors use various utility services, including electricity, natural gas, water, municipal steam heating, sewer, trash collection, internet access, telecommunication and other services. On average, prior to the Petition Date, the Debtors spent approximately $17,150 each month on account of Utility Services.

51.       Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of these Chapter 11 Cases. Any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations. I believe this disruption would adversely impact the Debtors' ability to operate their business in the ordinary course and could jeopardize the sale of substantially all of their assets. It is critical, therefore, that Utility Services continue uninterrupted during these Chapter 11 Cases.

21

Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

**F.      Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Their Insurance Program, and (II) Pay All Prepetition and Postpetition Obligations with Respect Thereto ("Insurance Motion")**

52.      Through the Insurance Motion, the Debtors are seeking authority to continue their existing Insurance Program and honor their related prepetition and postpetition obligations, as well as to renew, supplement, modify, extend, terminate, or purchase new insurance coverage in the ordinary course of business.

53.      The Debtors' Insurance Program is comprised of Commercial Insurance Policies that are administered through various Insurers, and which provide coverage for, among other things, commercial liability (property and general liability), automobile liability, employers' liability, cyber security liability, directors' and officers' liability, ocean cargo liability, accident liability, and fiduciary liability.  Maintenance of insurance coverage under the Insurance Program is essential to the continued operation of the Debtors' business and is required under the U.S. Trustee's Operating Guidelines, the laws of the various states in which the Debtors operate, applicable federal law, and certain of the Debtors' customer contracts and real estate leases. Accordingly, I respectfully submit that the Insurance Motion should be approved.

**G.      Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes ("Taxes Motion")**

54.      Through the Taxes Motion, the Debtors are seeking authority to pay certain prepetition taxes and related obligations.  In the ordinary course of business, the Debtors are subject to various taxes, regulatory fees and assessments, and related obligations (collectively, the "Taxes") that are payable directly to numerous Taxing Authorities.

22

55.     The Debtors seek the relief requested in this Motion in the event and to the extent that: (a) the various Taxes and related obligations that accrued or were assessed prior to the Petition Date: (i) were not paid prepetition; (ii) were not processed prepetition; or (iii) were paid in an amount that was less than is actually owed, including amounts subsequently determined upon any audit or otherwise to be due and owing for periods prior to the Petition Date; (b) any payments made prepetition were rejected, lost, not collected, or otherwise not received in full by any Taxing Authority; or (c) any Taxes and related obligations that accrued or were assessed prepetition, or will accrue or be assessed postpetition with respect to any prepetition period, will become due during the pendency of these Chapter 11 Cases in the ordinary course of business.

56.     The Debtors' failure to pay the Taxes could result in unnecessary penalties and fees, as well as potential personal liability to the Debtors' directors and officers.  In light of the foregoing, I respectfully submit that the relief requested in the Taxes Motion should be granted.

**H.     Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Shippers, Warehousemen, and Non-Lien Claimants and to Satisfy Customs Obligations; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief ("<u>Shippers and Warehouseman Motion</u>")**

57.     By the Shippers and Warehouseman Motion, the Debtors are seeking authority to pay certain prepetition claims of shippers, warehousemen, and other non-merchandise lien claimants, as well as to satisfy certain prepetition obligations related to customs duties imposed on shipments of goods from foreign suppliers.

58.     As noted above, the component parts of V-Go® are predominantly manufactured, tested, and packaged in China.  As such, the success of the Debtors' business is highly dependent on its international supply chain and third-party logistics providers, including the Shippers, who are reputable common carriers, movers, shippers, and freight forwarders, and the Warehousemen,

23

which include warehousemen, bailees, consignees, storage facilities, loading and unloading services, and other providers of storage services.  The Shippers and Warehouseman transport and store merchandise, goods, and supplies ranging from raw materials to commercial-stage medical technology, among others (collectively, the "Goods").

59.     The Debtors—and, importantly, the patients who have come to rely on V-Go® as part of their diabetes treatment regimen—depend on the timely delivery of Goods to the Debtors' distributors and other customers.  Given that the Shippers and Warehousemen have physical custody over many of the Debtors' Goods, the Debtors must incentivize them to continue performing and providing the Goods to the Debtors and their customers in a timely manner.  If the Shippers and Warehousemen do not receive payment for their prepetition claims, they may not continue to ship Goods on behalf of the Debtors, and the Debtors may be unable to meet their customer commitments.  This could result in significant operational issues and increased expenses, and, crucially, delay patient access to the Debtors' life-optimizing products on which they rely. All of this would also jeopardize the Debtors' sale process and the going concern value of the Debtors' business.

60.     In addition, the Debtors regularly make improvements and repairs to the property and equipment that they use in the ordinary course operation of their business, including their production lines, X-ray equipment, and various other types of equipment.  The Debtors contract with a number of third-party service providers for these improvements and repairs.  If unpaid, these service providers may be entitled to liens on the Debtors' real property under applicable mechanic's and materialmen's lien statutes or on equitable grounds (collectively, the "Non-Merchandise Lien Claimants").

61.    I am told that without payment of their prepetition claims, the Non-Merchandise Lien Claimants could potentially assert liens under applicable state or foreign law against the Debtors' property for amounts the Debtors owe to these third parties (collectively, the "Non-Merchandise Lien Claims").  If the Debtors are unable to pay the Non-Merchandise Lien Claims, the Debtors risk losing access to equipment, supply disruptions, as well as additional fees and charges and the potential imposition of mechanic's liens in the event of non-payment by the Debtors.  As such, I submit that the Debtors' payment of the Non-Merchandise Lien Claims as set forth in the Shippers and Warehouseman Motion is justified and appropriate.

62.    Finally, the Debtors are required to pay certain foreign duties, customs duties, and similar expenses (the "Customs Duties") related to purchasing and importing foreign Goods. These Goods are vital to the seamless, ordinary course operation of the Debtors' business.  In order to maintain an uninterrupted supply of imported Goods, the Debtors must pay the Customs Duties to the United States Customs and Border Protection Agency.  The Debtors are also required to post and maintain customs bonds to ensure the payment of Customs Duties imposed on imported Goods.  Customs Duties may be assessed over an ongoing trailing period of 300 days after the Debtors take possession of such imported Goods.  As such, the Debtors are seeking authority to remit Customs Duties relating to prepetition shipments and to post customs bonds that relate to prepetition Customs Duties to ensure the uninterrupted flow of Goods.

63.    I respectfully submit that the relief requested in this Motion is essential and should be granted to avoid immediate and irreparable harm to the Debtors' business.

I.      **Motion of the Debtors for Entry of an Order (I) Granting Administrative Expense Priority to All Undisputed Obligations for Goods Ordered Prepetition and Delivered Postpetition; (II) Authorizing the Debtors to Satisfy Such Obligations in the Ordinary Course of Business; and (III) Granting Related Relief ("Goods in Transit Motion")**

64.     Through the Goods in Transit Motion, the Debtors are seeking entry of interim and final orders granting administrative expense priority to all undisputed obligations for Goods ordered prepetition that have been or will be delivered postpetition and authorizing the Debtors to satisfy such obligations in the ordinary course of business.

65.     The Debtors estimate that they ordered approximately $200,000 in Goods that are vital to the production and manufacture of V-Go®.  Although these orders were placed to various Suppliers prior to the Petition Date, the Goods that are the subject of the Goods in Transit Motion had not been delivered as of the Petition Date (the "Outstanding Orders").  The Suppliers may be concerned that, because the Debtors' obligations under the Outstanding Orders arose prior to the Petition Date, such obligations would be treated as general unsecured claims in these Chapter 11 Cases and, accordingly, may refuse to provide the Goods to the Debtors (or may recall shipments thereof).  If this were to happen, the Debtors' ability to deliver V-Go® to market, and more importantly, to the patients that have come to rely upon V-Go®, would be severely hampered, and the going concern value of their business would be harmed.  [In addition, the failure of the Debtors to receive the Outstanding Orders could negatively impact the Debtors' borrowing base under their DIP Facility and jeopardize the funding of these Chapter 11 Cases.]  As such, I submit that the relief requested in the Goods in Transit Motion is critical to the success of these Chapter 11 Cases and should be granted.

**J.**     **Motion of the Debtors for Entry of Interim and Final Orders (I) Approving Continued Use of Current Cash Management System; (II) Authorizing the Debtors to Open and Close Bank Accounts; (III) Authorizing Banks to Honor Certain Transfers; (IV) Permitting the Continued Intercompany Transfers and Granting Administrative Expense Priority Status; (V) Suspending the Requirements of 11 U.S.C. § 345(b); and (VI) Granting Related Relief ("Cash Management Motion")**

66.     By the Cash Management Motion, the Debtors are seeking authority to continue using their existing cash management system (the "Cash Management System") and related relief.

67.     The Debtors' Cash Management System is comparable to the centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner.   The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.   The Debtors maintain daily oversight over the Cash Management System and have implemented cash management controls for entering, processing, and releasing funds.

68.     As part of their Cash Management System, in the ordinary course of business, the Debtors make Intercompany Transfers to add funds to the Payroll Account to cover payroll and the payment of excise, franchise and other taxes, and NASDAQ and other SEC registration fees (the "Intercompany Claims").   Accordingly, at any given time, there may be Intercompany Claims owing by one Debtor to another Debtor.   The Debtors are requesting authority to continue engaging in Intercompany Transfers in the ordinary course of business, and will track all postpetition Intercompany Transfers, without prejudice to any Debtor to request the reallocation or reimbursement of postpetition transfers.   The Debtors are also seeking to grant administrative expense priority status to postpetition Intercompany Claims held by a Debtor against one or more of the other Debtors.

69.    I believe that the continuation of the Debtors' Cash Management System is essential to the Debtors' business, and that any disruption in the Debtors' use of the Cash Management System, including the use of existing Business Forms, would severely disrupt the Debtors' business.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business without interruption in these Chapter 11 Cases. Accordingly, I respectfully submit that the Cash Management Motion should be approved.

**K.      Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Wages and Compensation, (II) Authorizing the Continuation of Employee Benefit Programs, (III) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations, and (IV) Granting Related Relief ("Employee Wage Motion")**

70.    As described above, the Debtors' Employees, who are highly trained and uniquely versed in the technical and other aspects of the Debtors' products and operations, are the lifeblood of their business.  The Debtors' Employees fill various critical roles in the Debtors' operations, so much so that the Stalking Horse Bidder intends to extend offers of employment (conditioned upon closing) to a majority of the Employees.

71.    By the Employee Wage Motion, the Debtors seek to alleviate any personal hardship faced by their Employees as a result of these Chapter 11 Cases, as well as to maintain the status quo pending the closing of a going concern sale of the Debtors' business.  To that end, the Debtors are seeking authority to pay prepetition wages and other compensation, taxes and withholdings, and reimbursable employee expenses.  The Debtors are also seeking authority to honor and continue benefit programs for their Employees, which are similar to programs offered by companies comparable in nature and size to the Debtors.

72.     The vast majority of the Debtors' Employees rely primarily or exclusively on the compensation and benefits they receive from the Debtors to pay their daily living expenses and support themselves and their families.  The relief requested in the Employee Wage Motion will help to avoid any Employee hardship, prevent employee attrition and boost morale during this critical transition period.

73.     In light of the importance of the Employees to the Debtors' business, I respectfully submit, on behalf of the Debtors, that the relief requested in the Employee Wage Motion is essential and should be granted.

**L.     Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay or Honor Prepetition Obligations to (A) Certain Critical Domestic Vendors and (B) Certain Critical Foreign Vendors; (II) Authorizing and Directing Financial Institutions to Honor All Related Checks and Electronic Payment Requests; (IV) Confirming the Application of Section 362 of the Bankruptcy Code to Such Foreign Vendors; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief ("Critical Vendors Motion")**

74.     The manufacturing and production of V-Go® is a highly regulated and complex process that relies upon certain key, dependable, and often, sole source, vendors, both foreign and domestic.  Certain of these key vendors, especially the Debtors' foreign vendors, are virtually irreplaceable; it could take more than a year to replace them due to the vetting, training, and level of trust necessary to bring V-Go® to market.

75.     In order to ensure the Debtors' continuing supply of V-Go® for existing and new patients, and to avoid providing an opening for the Debtors' competitors to encroach upon the Debtors' market share, the Debtors' manufacturing and supply chain must continue to operate without disruption during the postpetition period.   As such, through the Critical Vendors Motion, the Debtors are seeking authority to pay  the  prepetition  claims  of  certain Critical Domestic

29

Vendors and Critical Foreign Vendors, consistent with Customary Trade Terms in place prior to the Petition Date.

76.    The Debtors and their advisors have closely scrutinized each vendor in evaluating whether it should qualify as a "critical vendor."  As a result, the critical vendors list is limited only to those vendors who are absolutely essential to the Debtors' operations at this time.  Without the relief requested in this Motion, the Debtors' business would be seriously harmed.  For these reasons, I respectfully submit that the relief set forth in the Critical Vendors Motion should be granted.

    **M.**    **Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Schedule a Final Hearing; and (VI) Granting Related Relief ("DIP Motion")**

77.    Through the DIP Motion, the Debtors seek authorization to enter into a senior secured superpriority priming debtor-in-possession financing facility (the "DIP Facility") and to use their Cash Collateral (as that term is defined in section 363 of the Bankruptcy Code) in order to fund their operations and administer their Chapter 11 Cases.  The Prepetition Secured Parties have consented to be primed by the DIP Facility on the terms and conditions set forth in the DIP Facility and the proposed interim order approving it.

78.    Absent entry into the DIP Facility and use of Cash Collateral, the Debtors would be unable to fund their operations.  I understand that the DIP Facility will provide the Debtors with sufficient liquidity to continue operating their business in the ordinary course while pursuing consummation of a sale of their assets under section 363 of the Bankruptcy Code, for the ultimate the benefit of their creditors and other stakeholders.

79.     Accordingly, I believe that the DIP Facility and the use of Cash Collateral are essential for the Debtors to be able to effectuate their goals in these Chapter 11 Cases.  Without the additional liquidity afforded by the DIP Facility and access to Cash Collateral, the Debtors would be unable to continue their business or consummate the sale.  For these reasons, I respectfully submit that the relief requested in the DIP Motion should be granted.

I have reviewed each of the First Day Motions, the facts stated therein and the descriptions of the relief they request.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the contents of the First Day Motions and the contents of the foregoing Declaration are true and correct to the best of my information and belief.

February \_\_\_, 2020

John E. Timberlake
President and Chief Executive Officer